UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
CRAIG PRESNALL, BRIAN HUBER, JEFF
RUSHING, BRYAN SANDERS, as Trustee of the
2012 Sanders Trust, WILLIAM McCUTCHEN,
DELANO VINCE VINCENT, DAVID WILTGEN,
NICOLAS KYRIAZIS, HELEN KYRIAZIS, JOHN
KEITH TAYLOR, PERAN JED FORD, GARY
THOMPSON, JANIE HODGES, WILLIAM
CLAXTON, JONATHAN, BRUCE TURNER,
JEAN BORDELON, THOMAS HAAS, BENJAMIN
SWEERS, PATRICK OGNOWSKI, KEVIN
KNIGHT, DON BOOK, GARY MASSINGILL,
WILLIAM MARCINIAK, BARRY BENTLE and
KEN SANDERS,

                        Plaintiffs,

                                                    17-cv-6662 (PKC)

            -against-                               OPINION AND ORDER


ANALOGIC CORPORATION and ONCURA
PARTNERS DIAGNOSTICS, LLC,

                        Defendants.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

            Plaintiffs bring eight claims under New York law related to the acquisition of

defendant Oncura Partners Diagnostics, LLC ("Oncura") by defendant Analogic Corporation

("Analogic"). The 25 plaintiffs formerly held ownership interests in Oncura, a company that

marketed and sold ultrasound equipment used by veterinarian clinics. In January 2016, after a

fifteen-month negotiation, plaintiffs agreed to sell Oncura to Analogic, a company that

manufactured ultrasound equipment, including the systems sold by Oncura. The Complaint

asserts that after the acquisition, Oncura sales briefly soared, before Analogic's management

intentionally undermined Oncura in order to avoid paying plaintiffs certain agreed-upon, performance-based consideration.

Analogic's acquisition of Oncura was governed by an Agreement and Plan of Merger (the "Agreement"). Plaintiffs assert that they agreed to sell Oncura based on what they now describe as fraudulent misrepresentations about Analogic's business plans and the consideration they were to receive based on performance goals. Plaintiffs allege that, in truth, Analogic never intended to support Oncura's growth and expansion, deprived it of necessary resources and intentionally sought to avoid the payment of performance-based consideration.

Plaintiffs' First Amended Complaint (the "Complaint") asserts eight causes of action against Analogic and Oncura, all of them brought under New York law. Defendants move to dismiss five of those claims pursuant to Rule 12(b)(6), Fed. R. Civ. P., including claims for fraud, negligent misrepresentation, breach of the implied duty of good faith and fair dealing, unjust enrichment and declaratory judgment. Defendants do not move to dismiss plaintiffs' two claims for breach of contract and their claim of anticipatory repudiation.

For the reasons that will be explained, the Court concludes that the claims defendants seek to dismiss fall within the terms of the parties' agreements and are foreclosed by them. Defendants' motion to dismiss the non-contractual claims is therefore granted in its entirety.

BACKGROUND.

A.  <u>The Parties and the Negotiation of Analogic's Purchase of Oncura.</u>

Oncura was founded in 1999. (Compl't ¶ 47.)  According to plaintiffs, Oncura was a pioneer in selling ultrasound technology to veterinary practices. (Compl't ¶ 47.) Specifically, Oncura sold ultrasound equipment to smaller veterinary clinics that did not

previously have access to advanced animal-imaging technology, including equipment manufactured by Analogic. (Compl't ¶ 53.) Prominent Analogic products sold by Oncura included the SonixTablet and SonixOne ultrasound systems. (Compl't ¶¶ 53-55.)

Oncura was a limited liability company whose membership included twenty-four natural persons and one trust, all of whom are now plaintiffs in this action. (Compl't ¶¶ 13-38.) It was principally operated and managed, however, by three of its members, who are described as Oncura's "core management team:" plaintiffs Craig Presnall, Brian Huber and Jeff Rushing. (Compl't ¶ 48.) Presnall, Huber and Rushing collectively owned a majority ownership interest in Oncura. (Compl't ¶ 86.) Presnall was a founder of Oncura and its CEO, with more than 25 years of experience in the veterinary business, including work in the management of other companies and expertise in product launches. (Compl't ¶ 49.) Huber, a founder of Oncura and its president, had 30 years of experience as a veterinary doctor, and was the founder of two animal hospitals. (Compl't ¶ 50.) Rushing, who was Oncura's director of North American sales, is alleged to have been a successful and experienced sales professional with expertise in product launches. (Compl't ¶ 51.) In addition to Presnall, Huber and Rushing, plaintiff Delano Vince Vincent was Oncura's director of operations, and plaintiff David Wiltgen was Oncura's eastern zone sales manager. (Compl't ¶ 94.) These five plaintiffs are described throughout the Complaint as "Key Employees." (Compl't ¶ 39.)

The Complaint describes Analogic as "one of the largest manufacturers of imaging equipment in the world." (Compl't ¶ 60.) In 2014, Analogic first approached Oncura about a possible acquisition. (Compl't ¶ 85.) Plaintiffs rejected Analogic's initial attempts, but "Analogic was persistent." (Compl't ¶ 85.) In a meeting at Analogic's headquarters, Analogic executives praised plaintiff Presnall and the Oncura leadership team, and "made it clear" that, if

Analogic acquired Oncura, it would retain Oncura's existing management, given their history of successfully selling Analogic-manufactured products.  (Compl't ¶ 85.)

Oncura's executives began negotiating its potential sale to Analogic in or around October 2014, with "Key Employees" McCutcheon, Presnall, Huber and Rushing principally involved in the discussions.  (Compl't ¶ 86.)  A confidentiality agreement that was executed by Presnall on behalf of Oncura on October 13, 2014 provided in part that the parties "shall not be considered fiduciaries . . . but rather shall be free to act on an arms-length basis in accordance with their own respective self-interest, subject, however, to the obligation of the Undersigned Parties to act in good faith with each other with respect to activities hereunder."  (Levin Dec. Ex. 3 ¶ 5(a).)  Discussions centered on "solidifying" Oncura's future equipment needs.  (Compl't ¶ 87.)

During negotiations, Analogic executives stated that Analogic would soon release an upgraded ultrasound system, the bk500, to replace the SonixTablet and SonixOne machines.  (Compl't ¶ 87.)  They described the bk500 as "a state-of-the-art ultrasound machine" that would use the newest technologies and expand Oncura's market beyond the small-animal marketplace to include the equine marketplace.  (Compl't ¶ 87.)  The equine market was expected to be especially lucrative.  (Compl't ¶ 87.)

Plaintiffs allege that during negotiations, Analogic's executives knowingly misrepresented their intentions to support and expand Oncura.  They allege that Analogic's executives knew that the bk500 would not be introduced to the market by the expected date of September 2017.  (Compl't ¶ 87.)  Plaintiffs allege that Analogic knew that they would rely on the company's representations about the bk500 because information about the product was confidential and proprietary.  (Compl't ¶ 88.)

Plaintiffs also allege that Analogic fraudulently misrepresented that it would provide capital and hire and retain additional sales representatives. (Compl't ¶ 89.) Analogic also stated that it would provide Oncura with working capital needs, because Analogic would "own Oncura Partners forever." (Compl't ¶ 89.) Analogic also promised "the full support" of its marketing and accounting departments. (Compl't ¶ 91.) According to plaintiffs, Analogic management had no intention of providing marketing and accounting support, because Analogic did not want Oncura to reach its revenue goals and trigger any post-sale, performance-based payments to the plaintiffs. (Compl't ¶ 91.)

In a meeting of September 1, 2015, plaintiffs Presnall, Huber, Rushing and McCutcheon met with Analogic management to discuss the "earn-out" payment structure under the parties' proposed agreement, and the question of how Oncura would operate post-merger. (Compl't ¶ 92.) Huber stated that "Analogic could screw us" by not providing Oncura with necessary equipment, or sales, marketing and accounting personnel. (Compl't ¶ 92.) In response, Jim DaCosta, an Analogic vice president, assured plaintiffs to "trust us" that Analogic had made no misrepresentations. (Compl't ¶ 92.) According to the Complaint, negotiations "dragged on" as the parties encountered obstacles, but Analogic executives continued to implore plaintiffs to "trust them" about the accuracy of their representations. (Compl't ¶ 92.) Analogic showed plaintiffs recent renderings of the bk500, despite what plaintiffs assert was Analogic's intention to obstruct plaintiffs' "earn-out" goals and Oncura's access to technology. (Compl't ¶ 92.)

In a meeting of November 21, 2015, Analogic CEO Jim Green allegedly told plaintiffs Presnall, Huber and Rushing that Analogic would leave Oncura alone and permit existing management to run Oncura post-acquisition. (Compl't ¶ 93.) Green allegedly

acknowledged that Analogic "was not good" at integrating acquired companies, and would therefore remain "hands-off" as to Oncura.  (Compl't ¶ 93.)  Plaintiffs maintain that these statements were false when made.  (Compl't ¶ 93.)

B.  Analogic's Acquisition of Oncura.

Plaintiffs authorized the sale of Oncura, and Analogic's acquisition closed on January 5, 2016, through the execution of the Agreement.  (Compl't ¶ 100.)  On behalf of Oncura, the Agreement was executed by Presnall solely in his capacity as "Seller Representative," as well as separately executed by plaintiffs Presnall, Huber, Rushing and Bryan Sanders in their capacities as "Principal Sellers."  (Docket # 38-1 at 91.)

As described in the Complaint, Analogic agreed to pay plaintiffs "backloaded consideration in the form of lucrative and unlimited earn-out payments," which were determined based on Oncura's historic financial results and revenue forecasts.  (Compl't ¶ 102.)  The Agreement includes a schedule setting various performance thresholds for the "earn-out payments."  (Compl't ¶ 102.)  According to plaintiffs, Analogic modeled Oncura's performance to expect exponential growth, owing largely to the untapped equine market.  (Compl't ¶ 103.)  Plaintiffs state that they agreed to the revenue targets due to Analogic's representations about the availability of the bk500 device.  (Compl't ¶ 103.)  Under section 2.9 of the Agreement, each plaintiff would be entitled to a pro-rated share of any earn-out payment.  (Compl't ¶ 104.)  Plaintiffs allege that the earn-out payments "were a critical component" of compensation, allowing plaintiffs to receive "unlimited additional consideration" tied to Oncura's revenue and gross margin.  (Compl't ¶ 105.)

In addition to the Agreement, the "Key Employees" entered into a series of employment agreements with Analogic and Oncura (the "Employment Agreements").  (Compl't

¶ 94.)  Under the Employment Agreements, Presnall was hired as Oncura' CEO, Huber as president and medical director, Rushing as director of sales, Vincent as director of operations and Wiltgen as eastern zone sales manager.  (Compl't ¶ 94.)  An exemplar of the Employment Agreements was incorporated into the Agreement and annexed to it as Exhibit D, and paragraph 7.2(f) of the Agreement required that, as a condition to the transaction's completion, the Employment Agreements "shall be in full force and effect as against [Analogic]."  (Docket # 38-1 at 79, 130-40, 54.)

Each of the Employment Agreements contained identical terms and conditions entitling the employee to certain compensation and benefits.  (Compl't ¶ 95.)  This included a quarterly performance-based cash incentive and long-term incentives in the form of Analogic common stock.  (Compl't ¶¶ 96-97.)  Plaintiffs state that without the incentive-based and stock awards, they would not have entered into the employment agreements.  (Compl't ¶ 98.)

The Agreement also included language governing Analogic's operations of Oncura and the payment of performance-based consideration.  Paragraph 2.9(f) of the Agreement included language governing Analogic's "right to operate its business" consistent with its best interests.  That provision states that through the Agreement, plaintiffs "agree and acknowledge that [Analogic] has a right to operate its business (including, after the Closing, the business of [Oncura]) in a manner consistent with the best interests of the consolidated business operations of the Buyer and its subsidiaries, taken as a whole . . . ."  (Docket # 38-1 at 20.)  The Agreement then stated that, in exercising this right, Analogic could make decisions that would affect any "Earn-Out Payment" owed to plaintiffs.  (Id.)  It provided, however, that Analogic could not "knowingly, intentionally or deliberately" take actions for the purpose of avoiding making an "Earn-Out Payment" to plaintiffs.  (Id.)

C.  Events Subsequent to the Acquisition.

After the acquisition closed, Oncura "was immediately incorporated into" Analogic's ultrasound reporting segment.  (Compl't ¶ 100.)  According to the Complaint, Oncura's veterinary business "initially thrived" after the transaction.  (Compl't ¶ 110.)  In the months after the acquisition, Oncura was on track to increase its sales by 70%, and more than doubled the number of ultrasound units sold over the previous year.  (Compl't ¶ 110.)

Plaintiffs allege that Analogic then sought "to run Oncura Partners into the ground."  (Compl't at 34.)  Analogic's new CEO, Fred Parks, told Huber and Presnall that Analogic never should have purchased Oncura, and that the transaction was viewed as a way to give Analogic's outgoing CEO a "win."  (Compl't ¶ 113.)  Plaintiffs allege that Analogic then delegated one of is executives, Jim Da Costa, "with overseeing and dismantling [Oncura's] business."  (Compl't ¶ 114.)  The Complaint states that Da Costa was "chaotic, abusive and toxic" to Oncura, and managed Oncura from afar.  (Compl't ¶¶ 115-16.)  After a quarter of sales growth, Da Costa allegedly removed all decision making power from Presnall, Huber and Rushing, prompting a "steady departure" of personnel.  (Compl't ¶ 117.)  Da Costa refused to hire additional sales personnel and launched "personal verbal attacks" on Presnall, Huber and Rushing.  (Compl't ¶¶ 118-21.)  According to plaintiffs, Da Costa also disrupted Oncura by "forcing" employees to work on "useless and menial tasks" that distracted them from running the business.  (Compl't ¶¶ 122-23.)  According to the Complaint, Da Costa, with the encouragement of Analogic, was working to intentionally prevent Oncura and its management from reaching earn-out targets and attaining the corresponding compensation.  (Compl't ¶ 124.)

The Complaint asserts that from the time that the Agreement was executed through the end of 2016, it "became obvious" that Analogic was attempting to phase out

Oncura's business, that Analogic never intended to bring Oncura into the lucrative equine ultrasound market and that Analogic was pursuing a scheme to thwart the awarding of any earn-out payments.  (Compl't ¶ 126.)  Plaintiffs also assert that Analogic never had an intention to manufacture the bk500 ultrasound system, and that it did not disclose during negotiations that it was planning to discontinue the SonixTab and SonixOne ultrasound systems.  (Compl't ¶ 127.)  Without those ultrasound products, there was nothing for Oncura to sell.  (Compl't ¶ 127.)  Plaintiffs also allege that Analogic failed to assign dedicated marketing personnel to Oncura, which resulted in billing and accounting errors.  (Compl't ¶ 128.)

The Complaint asserts that Presnall, Huber and Rushing appealed directly to Parks, the CEO of Analogic, in March 2017.  (Compl't ¶ 130.)  Parks allegedly promised to resolve their concerns, but then took no action.  (Compl't ¶ 130.)  The Complaint alleges that Analogic "engaged in pretextual activity beyond its rights" under the Agreement in order to prevent plaintiffs "from receiving the benefits of the [Agreement] . . . ."  (Compl't ¶ 130.)

In Analogic's Form 10-Q filed with the SEC for the quarterly reporting period ending on April 30, 2017, Analogic wrote off $10.2 million in "contingent consideration liability" that it had set aside in connection with the Oncura acquisition, and accounted for it as a financial gain.  (Compl't ¶ 131.)  The filing "completely impaired all of [Oncura's] intangible assets," including patent-pending technology and company goodwill.  (Compl't ¶ 131.)  "Stated differently, Analogic was successful in its scheme to destroy Oncura Partners post-merger and had its auditors paint the company as worthless."  (Compl't ¶ 131.)

According to the Complaint, Analogic chose "to dismantle" Oncura despite its most successful quarter in company history in order to avoid paying plaintiffs "the consideration it owned them under the [Agreement]."  (Compl't ¶ 133.)  It alleges that Analogic acquired

Oncura to bolster the reputation of a departing CEO and gain access to Oncura's patent-pending technology, with no intention to provide it with promised technology and personnel. (Compl't ¶ 133.)

In July and August 2017, Analogic terminated, without cause, all five of the plaintiffs denoted as "Key Employees." (Compl't ¶ 134.) The Complaint asserts that Presnall, Huber and Rushing were offered severance packages that did not comply with the terms of their Employment Agreements. (Compl't ¶¶ 136-139.)

During a quarterly earnings call of September 19, 2017, Analogic stated that it would sell the entire company, including Oncura. (Compl't ¶ 139.)

D. Procedural History.

Plaintiffs commenced this action by filing a complaint in state court in Travis County, Texas, which defendants removed to the United States Court of the Western District of Texas, on the basis of diversity jurisdiction. (Docket # 1.) The action was then transferred to this District pursuant to 28 U.S.C. § 1404(a). (Docket # 10.)

There is complete diversity of citizenship pursuant 28 U.S.C. § 1332. All plaintiffs are alleged to have been "Holders" of Oncura prior to its acquisition by Analogic. (Compl't ¶ 38.) The 25 plaintiffs include citizens of Texas, Arizona, Minnesota and Pennsylvania. (Compl't ¶¶ 13-37.) Analogic is a Massachusetts corporation with its principal place of business in Massachusetts. (Compl't ¶ 40.) Oncura is a limited liability company, the sole member of which is Analogic. (Removal Pet. ¶ 10.)

As noted, the Complaint brings eight causes of action under New York law. The Agreement provides that it "shall be governed in all respects" by New York law without giving effect to the conflicts of law provisions of New York or any other state. (Docket # 38-1 at 87.)

The parties to the Agreement also consented "to the exclusive personal jurisdiction of the United States District Court for the Southern District of New York," and agreed that any claims related to the Agreement and the underlying transactions would be heard in this District. (Docket # 38-1 at 88)

MOTION TO DISMISS STANDARD

Rule 12(b)(6) requires a complaint to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In assessing the sufficiency of a pleading, a court must disregard legal conclusions, which are not entitled to the presumption of truth. Id. Instead, the Court must examine the well-pleaded factual allegations and "determine whether they plausibly give rise to an entitlement to relief." Id. at 679. "Dismissal is appropriate when 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.'" Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE, 763 F.3d 198, 208-09 (2d Cir. 2014) (quoting Conopco, Inc. v. Roll Int'l, 231 F.3d 82, 86 (2d Cir. 2000)).

In deciding a motion to dismiss pursuant to Rule 12(b)(6), a court may consider a document that is integral to the complaint. Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016). "A document is integral to the complaint 'where the complaint relies heavily upon its terms and effect.'" Id. (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002)). "This generally occurs when the material considered is a 'contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason – usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim – was not attached to the complaint.'" Nicosia v.

Amazon.com, Inc., 834 F.3d 220, 231 (2d Cir. 2016) (quoting Global Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 156 (2d Cir. 2006)).  In reviewing defendants' motion to dismiss, the Court relies in part on the text of the Agreement, which is referenced throughout the Complaint, and was submitted as an exhibit to the Declaration of Hallie B. Levin.  (Docket # 38-1.)

DISCUSSION

I.    Defendants' Motion to Dismiss the Fraud Claim Is Granted.

Under New York law, "[t]he elements of a fraud cause of action consist of 'a misrepresentation or a material omission of fact which was false and known to be false by [the] defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury.'"  Pasternack v. Lab. Corp. of Am. Holdings, 27 N.Y.3d 817, 827 (2016) (quoting Mandarin Trading Ltd. v. Wildenstein, 16 N.Y.3d 173, 178 (2011)).

"[A] fraud claim is not stated by allegations that simply duplicate, in the facts alleged and damages sought, a claim for breach of contract, enhanced only by conclusory allegations that the pleader's adversary made a promise while harboring the concealed intent not to perform it."  Cronos Grp. Ltd. v. XComIP, LLC, 156 A.D.3d 54, 62 (1st Dep't 2017) (collecting cases).  "[I]f the promise concerned the performance of the contract itself, the fraud claim is subject to dismissal as duplicative."  Id. at 63 (quotation marks omitted).  "A fraud-based cause of action may lie, however, where the plaintiff pleads a breach of a duty separate from a breach of the contract."  Manas v. VMS Assocs., LLC, 53 A.D.3d 451, 453 (1st Dep't 2008); see also HSH Nordbank AG v. UBS AG, 95 A.D.3d 185, 206 (1st Dep't 2012) ("A claim for fraudulent inducement of contract can be predicated upon an insincere promise of future

performance only where the alleged false promise is <u>collateral</u> to the contract the parties executed; if the promise concerned the performance of the contract itself, the fraud claim is subject to dismissal as duplicative of the claim for breach of contract.") (emphasis in original).

      As will be discussed, the plaintiffs' fraud claim is dismissed because the facts alleged in support of it are subsumed within, and redundant to, their breach of contract claim. Separately, the Complaint does not plausibly allege fraud because it describes only an unexpressed intent not to perform under the Agreement, accompanied by conclusory allegations of Analogic's concealed intent.

      The Court first reviews the conduct alleged to constitute fraud. The Complaint alleges that Analogic fraudulently induced plaintiffs to enter into the Agreement by making misrepresentations about eight different subjects. (Compl't ¶ 155.) Plaintiffs allege that Analogic misrepresented that 1.) Presnall, Huber and Rushing would "be in charge of making operational decisions for Oncura" after the acquisition; 2.) Analogic would use $2 million in working capital provided by plaintiffs to help grow Oncura; 3.) Analogic would provide Oncura with additional sales and marketing personnel; 4.) Analogic would provide Oncura full-time accounting personnel; 5.) Analogic would provide Oncura "with a steady stream of products and customer support . . . ."; 6.) the bk500 would hit the market in September 2017 and replace Analogic's existing product lines; 7.) Analogic would assist Oncura's entry into the equine market; and 8.) Analogic fraudulently failed to disclose that it would discontinue production of its SonixOne and SonixTablet products without providing a replacement product line. (Compl't ¶ 155.) Plaintiffs allege that Analogic's statements were false and misleading, and that they were material to their decision to sell Oncura. (Compl't ¶¶ 157-58.) They also allege that these

misrepresentations were material to the Key Employees' decision to enter into the Employment Agreements. (Compl't ¶¶ 158-59.) As alleged in the Complaint:

> Stated differently, had the Key Employees known that they were not going to be in charge of operating Oncura Partners and, moreover, that Analogic intended to not provide the necessary resources to enable the Key Employees to achieve any performance-based compensation under the Key Employment Agreements, the Key Employees would not have entered into the Key Employment Agreements.

(Compl't ¶ 161.)

Although styled differently, the breach of contract claim is also directed toward Analogic's failure to provide full consideration to plaintiffs, and Analogic's purported failure to support Oncura in an effort to avoid paying full consideration. Plaintiffs allege that Analogic breached the Agreement's "earn-out payment provision," pursuant to which Analogic was to provide plaintiffs "with additional consideration . . . upon attaining certain revenue and profit margin targets." (Compl't ¶ 145.) The Complaint describes the earn-out provision as "fundamental and vital" to the Agreement. (Compl't ¶ 145.) The earn-out payment provision is set forth at paragraph 2.9, which provided for "additional consideration" in the event that Oncura met defined growth targets. (Docket # 38-1 at 18-21.) Paragraph 2.9(f) stated that Analogic "will not knowingly, intentionally or deliberately take any action for the purpose of avoiding the payment of any Earn-Out Payment." (Id. at 20.) The same paragraph provides that plaintiffs "will have no right to recover" any lost earn-out payments as a result of Analogic's business decisions unless they "can establish" that Analogic "knowingly, intentionally or deliberately" took actions to avoid paying an earn-out payment. (Id.) The breach of contract claim alleges that Analogic breached the Agreements "by knowingly, intentionally, or deliberately taking actions for the purpose of avoiding the payment of Earn-Out Payments . . . ." (Compl't ¶ 147.)

The Court concludes that the fraud claim falls within the breach of contract claim and the text of paragraph 2.9(f). While the fraud claim does not expressly cite the earn-out provision, it alleges that Analogic's purported fraud was undertaken with the intention "to not provide the necessary resources . . . to achieve any performance-based compensation" under the Employment Agreements. (Compl't ¶ 161.) The contract claim is directed to Analogic's promise in paragraph 2.9(f) not to "knowingly, intentionally or deliberately" take actions for the purposing "of avoiding" any earn-out payment owed to plaintiffs. (Compl't ¶¶ 146-47 & Docket # 38-1 at 20.) The earn-out payments were the parties' agreed-upon, performance-based compensation. (Agrm't ¶ 2.9(c) & Schedule 2.9.)

Plaintiffs' theory of fraud as to Analogic's failure to make necessary resources available to Oncura also implicates the provision that the parties "agree and acknowledge" that Analogic had "the right to operate its business," including Oncura, "in a manner consistent with" the best interests of Analogic and all subsidiaries taken as a whole, which the Agreement defined as Analogic's "Right to Operate." (Docket # 38-1 at 20.) The "Right to Operate" gave Analogic authority to manage Oncura consistent with Analogic's overall business needs, provided that it did not "take any action for the purpose of avoiding the payment of any Earn-Out Payment." (Id.) Any actions by Analogic that are alleged to have been for the purpose of impeding, frustrating or avoiding the earn-out provision must be assessed in the context of the Agreement's "Right to Operate" provision.

Both the fraud claim and the breach of contract claim assert that Analogic intentionally impeded Oncura's business and growth in order to avoid making earn-out payments to the plaintiffs. The fraud claim is therefore dismissed as duplicative to the contract claim. See Cronos, 156 A.D.3d at 63 ("[I]f the promise concerned the performance of the contract itself, the

fraud claim is subject to dismissal as duplicative."); Havell Capital Enhanced Mun. Income Fund, L.P. v. Citibank, N.A., 84 A.D.3d 588, 589 (1st Dep't 2011) (dismissing fraud claim that "arose from the same facts, sought identical damages and did not allege a breach of any duty collateral to or independent of the parties' agreements . . . .").

The Complaint's fraud claim is also dismissed for the separate reason that it is premised on a conclusory assertion that Analogic never intended to perform under the Agreement. But a plaintiff cannot plausibly allege fraud by raising conclusory allegations of a concealed intent not to perform. See Cronos Grp., 156 A.D.3d at 62. Because the fraud claim alleges only an intent not to perform under the Agreement, accompanied by conclusory allegations of concealed intent, the fraud claim is dismissed.

Lastly, plaintiffs cite to MBIA Insurance Corp. v. Countrywide Home Loans, Inc., 87 A.D.3d 287, 294 (1st Dep't 2011), as support for the principle that a fraud claim may proceed alongside a contract claim based on the same facts. In MBIA, however, plaintiffs alleged that the originator of loans pooled into a mortgage-backed securities trust made misrepresentations of known, then-existing facts about the trust's mortgage loans, including existing facts about borrowers' resources, the loans' terms, and originators' compliance with underwriting guidelines. Id. at 294. By contrast, in this case, plaintiffs have alleged misrepresentations about Analogic's intent to perform under the Agreement.

Because it is duplicative of plaintiff's breach of contract claim and is premised on Analogic's concealed intent not to perform, defendants' motion to dismiss the fraud claim is granted.

II.    Plaintiffs Have Not Plausibly Alleged a Claim of Negligent
       Misrepresentation.

"A claim for negligent misrepresentation requires the plaintiff to demonstrate (1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information." J.A.O. Acquisition Corp. v. Stavitsky, 8 N.Y.3d 144, 148 (2007).

Plaintiffs' negligent misrepresentation claim is directed to the same eight purported material misstatements that form the basis of the fraud claim. (Compl't ¶ 166.) The Complaint alleges that Analogic did not exercise reasonable care or competence in making these statements, and made misrepresentations with the intent to induce plaintiffs into approving the sale of Oncura. (Compl't ¶ 170.) It asserts that Analogic had unique, non-public knowledge of this information, and that plaintiffs could not have known that Analogic's statements were false or misleading. (Compl't ¶¶ 170-72.) Plaintiffs allege that they had a special relationship with Analogic due to Analogic's longstanding knowledge about Oncura's business, and that their reliance on Analogic was justifiable. (Compl't ¶ 164.)

For reasons that will be explained, the Court concludes that the Complaint has not alleged a "special relationship" between plaintiffs and Analogic that is sufficient to support a negligent misrepresentation claim. It separately concludes that the purported misrepresentations related to future performance and therefore cannot form the basis of a negligent misrepresentation claim. The claim is therefore dismissed.

A.  The Complaint Does Not Plausibly Allege a "Special Relationship" between
    Plaintiffs and Analogic.

First, the negligent misrepresentation claim is dismissed because the Complaint fails to plausibly allege a special relationship between plaintiffs and Analogic. "A claim for

negligent misrepresentation requires a showing of a special relationship of trust or confidence between the parties which creates a duty for one party to impart correct information to another. Generally, a special relationship does not arise out of an ordinary arm's length business transaction between two parties." MBIA, 87 A.D.3d at 296 (internal citations omitted). Often, such a "special relationship" will arise in the context of a layperson's reliance on a professional, such as a lawyer or engineer, whereas in a commercial transaction between sophisticated parties, such a relationship "must" be based on "some identifiable source of a special duty of care." Kimmell v. Schaefer, 89 N.Y.2d 257, 263-64 (1996).

In support of the existence of a special relationship, plaintiffs point out that Analogic knew of the company's own inner workings in a way that plaintiffs did not, including the manufacturing timetable for the bk500, and that when plaintiffs expressed concern that "Analogic could screw us," the company's management implored plaintiffs to "trust us." (Compl't ¶ 92.) The Complaint also alleges that plaintiffs had "a special relationship of trust" to Analogic because, prior to its acquisition, Oncura relied so heavily on Analogic technology. (Compl't ¶ 53.) It also asserts that because Analogic was the "exclusive equipment provider" for Oncura prior to the acquisition, it knew Oncura's non-public sales revenue. (Compl't ¶ 101.) Plaintiffs observe that a commercial, arms-length transaction was at issue in Kimmel, in which the New York Court of Appeals held that a company's chairman and chief financial officer could be liable for making negligent representations to investors about projected revenues that he knew were based on incorrect information. 89 N.Y.2d at 263-65.

In the context of a Complaint that alleges a significant, arms-length business transaction, plaintiffs have not adequately or plausibly alleged a special relationship between plaintiffs and Analogic. Analogic may have had significant expertise in its own technology, and

knowledge of Oncura's business based on prior dealings, but those facts do not plausibly allege a "special relationship" in the context of this heavily negotiated acquisition of plaintiffs' business. The Complaint describes a lengthy, fifteen-month negotiation that was often adversarial and undertaken by sophisticated parties.

In <u>MBIA</u>, the First Department concluded that a defendant's "superior knowledge of the particulars of its own business practices" did not establish a special relationship given that the parties were "sophisticated commercial entities engaged in . . . an arm's length business transaction . . . ." 87 A.D.3d at 297. <u>MBIA</u> is consistent with the large body of New York authority that has concluded that a "special relationship" does not arise in a typical commercial transaction. <u>Gomez-Jimenez v. New York Law Sch.</u>, 103 A.D.3d 13, 18-19 (1st Dep't 2012) ("because plaintiffs have not alleged any special relationship or fiduciary obligation requiring a duty of full and complete disclosure from defendants to its prospective students, we dismiss plaintiff's claim to the extent that it is based on . . . negligent misrepresentation."); <u>Parisi v. Metroflag Polo, LLC</u>, 51 A.D.3d 424, 424 (1st Dep't 2008) (dismissing negligent misrepresentation claim when defendants "were nonprofessionals who negotiated an arm's length commercial contract with plaintiffs and had no special relationship with them."); <u>United Safety of Am., Inc. v. Consol. Edison Co. of New York</u>, 213 A.D.2d 283, 285-86 (1st Dep't 1995) ("A claim for negligent misrepresentation can only stand in the presence of a special relationship of trust or confidence, which creates a duty for one party to impart correct information to another. A simple arm's length business relationship is not enough.") (citations omitted); <u>Andres v. LeRoy Adventures, Inc.</u>, 201 A.D.2d 262, 262 (1st Dep't 1994) (negligent misrepresentation claim was properly dismissed because the parties' "arm's length dealings" did not create a special relationship).

Plaintiffs urge that, at the pleading stage, the Court should not presume their business sophistication or their reliance during the negotiations on outside counsel at Kasowitz Benson Torres LLP ("Kasowitz"). However, the Complaint itself alleges that the plaintiffs who negotiated with Analogic had extensive industry and business experience: over his career, Presnall allegedly launched more than twenty veterinary products, held a position where he managed $65 million in annual sales, and was president and director of the companies SigmaRX and Sigma Global Health Corporation; Huber is identified as an experienced veterinarian who founded two animal hospitals, as well as a mobile ultrasound and endoscopy veterinary service; and Rushing is described as a successful veterinary sales professional who "took lead" on "many" new product launches. (Compl't ¶¶ 49-51.) The Complaint itself attributes significant business experience and sophistication to these plaintiffs. As to the role of outside counsel, the Agreement and its exhibits identify Kasowitz as Oncura's attorney; one exhibit directs "Holders" of Oncura to contact Kasowitz with any questions about the transaction. (Docket # 38-1 at 85, 117, 180, 186, 190.) The text of the Complaint and the Agreement, both properly considered on this motion, undermine plaintiffs' argument that their sophistication ought not be considered on a Rule 12(b)(6) motion.

Further, a confidentiality agreement, executed by Presnall on behalf of Oncura, provided in part that the parties "shall not be considered fiduciaries or to have established a confidential relationship but rather shall be free to act on an arms-length basis in accordance with their own respective self-interest, subject, however, to the obligation of the Undersigned Parties to act in good faith with each other with respect to activities hereunder." (Levin Dec. Ex. 3 ¶ 5(a).) The Agreement incorporates this confidentiality agreement, and provides that it "shall continue in full force and effect in accordance with its terms . . . ." (Docket # 38-1 at 48.) The

text of the confidentiality agreement, which disavows any fiduciary obligation and provides for an "arms-length" negotiation, is inconsistent with a special relationship of trust between parties to a commercial transaction.

Accepting the truth of the Complaint and drawing every reasonable inference in favor of the plaintiffs, the Court concludes that plaintiffs have not plausibly alleged a "special relationship" with Analogic, and their negligent misrepresentation claim is therefore dismissed.

### B. The Complaint Does Not Plausibly Allege the Misstatement of a Known, Then-Existing Fact.

Plaintiffs' negligent misrepresentation claim is separately dismissed because, like plaintiffs' fraud claim, it is based on statements regarding Analogic's future performance under the Agreement.

As discussed, the misrepresentations alleged by plaintiffs all related to Analogic's statements concerning its intention to perform under the Agreement, and do not plausibly identify statements that misrepresent known, then-existing facts. This is insufficient to allege a claim of negligent misrepresentation. See Capricorn Inv'rs III, L.P. v. Coolbrands Int'l, Inc., 66 A.D.3d 409, 409 (1st Dep't 2009) ("The court correctly dismissed the claim of negligent misrepresentation because it is predicated upon promises of future conduct, rather than statements as to 'existing material fact.'"); DaCosta v. Trade-Winds Envtl. Restoration, Inc., 61 A.D.3d 627, 628 (1st Dep't 2009) ("The respondents' purported declarations that the plaintiff's property would not be harmed during the decontamination process were, at most, promises of future intent rather than misrepresentations of existing fact and are not actionable.").

Because plaintiffs' negligent representation claim is premised on statements going toward a future intent to perform, and not to then-known facts, the negligent misrepresentation claim is dismissed.

III.    Plaintiffs' Claim for Breach of the Implied Duty of Good Faith and Fair Dealing Is Dismissed.

Analogic moves to dismiss plaintiffs' claim for breach of the implied duty of good faith and fair dealing on the grounds that is duplicative to plaintiffs' breach of contract claim. Because plaintiffs' implied duty claim is based on the same facts and seeks the same damages as their breach of contract claim, the implied duty claim is dismissed.

"[I]n every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing." Kirke La Shelle Co. v. Paul Armstrong Co., 263 N.Y. 79, 87 (1933). When a complaint's allegations going to a defendant's breach of an implied duty are "premised on the same conduct as the breach of contract claim and [are] intrinsically tied to the damages allegedly resulting from a breach of the contract," the implied duty claim should be dismissed. Art Capital Grp., LLC v. Carlyle Inv. Mgmt. LLC, 151 A.D.3d 604, 605 (1st Dep't 2017) (quotation marks omitted); accord Netologic, Inc. v. Goldman Sachs Grp., Inc., 110 A.D.3d 433, 433-34 (1st Dep't 2013) (same); Amcan Holdings, Inc. v. Canadian Imperial Bank of Commerce, 70 A.D.3d 423, 426 (1st Dep't 2010) (same)

The claim for breach of the implied duty is duplicative of plaintiffs' breach of contract claim. As discussed, the breach of contract claim alleges that Analogic breached the "earn-out payment provision" that required additional payments to plaintiffs upon reaching revenue and profit-margin targets. (Compl't ¶¶ 145, 147.) The implied duty claim is based on the identical assertion that Analogic "deprived Plaintiffs of their ability to fully perform under the Merger Agreement" and did not permit them to "exploit the benefits of the Merger Agreement's earn-out provision." (Compl't ¶ 177.) The implied duty claim asserts that

Analogic's engaged in "pretextual activity . . . so that Analogic could ultimately escape its liability to make lucrative earn-out payments under the Merger Agreement and hamper [Oncura's] business." (Compl't ¶ 178.)

Because both the breach of contract claim and the implied duty claim assert that Analogic intentionally obstructed Oncura's business and did so for the purpose of precluding earn-out payments to the plaintiffs, the implied duty claim is redundant to the breach of contract claim. It therefore is dismissed.

IV.    Plaintiffs' Unjust Enrichment Claim Is Dismissed.

Analogic moves to dismiss plaintiffs' claim for unjust enrichment. Because the Complaint has alleged a valid claim for breach of contract that encompasses the allegations of the unjust enrichment claim, Analogic's motion is granted.

"[I]n order to sustain an unjust enrichment claim, a plaintiff must show that (1) the other party was enriched, (2) at the plaintiff's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." E.J. Brooks Co. v. Cambridge Sec. Seals, 31 N.Y.3d 441, 455 (2018) (quotation marks and alterations omitted). When a plaintiff has asserted a viable breach of contract claim, an unjust enrichment claim should be dismissed as redundant. See, e.g., Schultz v. Gershman, 68 A.D.3d 426, 427 (1st Dep't 2009) ("Plaintiffs' unjust enrichment cause of action is barred by the existence of the contract between the parties."); Sergeants Benevolent Ass'n Annuity Fund v. Renck, 19 A.D.3d 107, 119 (1st Dep't 2005) ("Since this dispute is governed by the terms of an express contract, the cause of action for unjust enrichment was properly dismissed as redundant."). However, a claim for unjust enrichment may properly proceed where the alleged wrongdoing is not covered

by the contract, or where a claim covered by the contract has been dismissed. <u>EBC I, Inc. v.</u> <u>Goldman Sachs & Co.</u>, 7 A.D.3d 418, 420-21 (1st Dep't 2004).

Here, plaintiffs' unjust enrichment claim is redundant to their breach of contract claim. It asserts that Analogic took deliberate actions "for the purpose of avoiding payment under the earn-out payment," terminated employees, halted production of products sold by Oncura and made misrepresentations to induce plaintiffs to sell Oncura. (Compl't ¶ 183.) Plaintiffs' breach of contract claim asserts that Analogic failed to provide the promised resources to Oncura in order to avoid the payment of performance-based consideration to the plaintiffs. Defendant has not move against the breach of contract claim.

The unjust enrichment claim is therefore dismissed.

V.      <u>Plaintiffs' Claim for Declaratory Judgment Is Dismissed.</u>

Plaintiffs bring a claim for declaratory judgment against Analogic and Oncura. This claim is directed entirely to issues related to the interpretation and enforcement of the Agreement and the Employment Agreements. It seeks "a determination and construction" and a declaration as to the following subjects: on the ongoing enforceability of paragraph 2.9 of the Agreement in the event that Oncura is sold to a third party; issues related to the interpretation of paragraphs 2.9(f) and 13.2 of the Agreement; whether the "Disclosure Statement" annexed to the Agreement is enforceable; whether Analogic was the first party to materially breach the Agreement, and whether Analogic and Oncura were the first parties to materially breach the Employment Agreements; and a declaration that plaintiffs complied with the Agreement and the Employment Agreements in all material respects. (Compl't ¶ 192.)

"In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations

of any interested party seeking such declaration . . . ."  28 U.S.C.A. § 2201(a).  "The Declaratory

Judgment Act confers on federal courts 'unique and substantial discretion in deciding whether to

declare the rights of litigants.'"  <u>Peconic Baykeeper, Inc. v. Suffolk Cnty.</u>, 600 F.3d 180, 187 (2d

Cir. 2010) (quoting <u>Wilton v. Seven Falls Co.</u>, 515 U.S. 277, 286 (1995)).  "'The propriety of

issuing a declaratory judgment may depend upon equitable considerations and is also informed

by the teachings and experience concerning the functions and extent of federal judicial power.'"

<u>Id.</u> (quoting <u>Green v. Mansour</u>, 474 U.S. 64, 72 (1985)).

 The declaratory judgment claim is dismissed.  The claim is superfluous because it

is directed toward the interpretation and application of the Agreement, which is subject to

construction, interpretation and application in the context of plaintiffs' breach of contract claim.

Because the parties' obligations under the Agreement can be resolved by that claim, a

declaratory judgment would serve no useful purpose.  <u>See</u> <u>Fleisher v. Phoenix Life Ins. Co.</u>, 858

F. Supp. 2d 290, 302 (S.D.N.Y. 2012) (declaratory judgment serves no useful purpose when it is

directed legal issues that will be resolved by a breach of contract claim) (McMahon, J.)

(collecting cases).

 In addition, declaratory relief is generally intended to have a prospective effect,

meaning that "a plaintiff must demonstrate a 'certainly impending' future injury," and "cannot

rely solely on past injuries . . . ."  <u>Marcavage v. City of N.Y.</u>, 689 F.3d 98, 103 (2d Cir. 2012).

The only prospective relief seeks a declaration related to any obligations a future purchaser of

Oncura may have pursuant to section 2.9 of the Agreement.  The Complaint makes no

allegations as to whether a sale of Oncura is imminent, and does not identify any dispute by a

potential acquiror as to its obligations under section 2.9.  The only declaratory relief sought is

hypothetical or retrospective. For this additional reason, the Court declines to exercise its discretion to issue declaratory relief.

Plaintiffs' declaratory judgment claim is therefore dismissed.

CONCLUSION.

The defendants' motion is granted in its entirety. The Clerk is directed to terminate the motion and the related letter-motion. (Docket # 36, 39.)

The remaining claims in this action assert claims of breach of contract and anticipatory repudiation against Analogic, and breach of the Employment Agreements against both Analogic and Oncura.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
September 18, 2018